**Supreme Court**

No. 2013-289-C.A.

(K1/12-341A)

State                                    :

v.                                       :

Tony Gonzalez.                           :


NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

| State | : |
| :--- | :--- |
| v. | : |
| Tony Gonzalez. | : |

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Robinson, for the Court.** The defendant, Tony Gonzalez, appeals from his conviction following a jury trial in Kent County Superior Court. The defendant was convicted of one count of murder in the first degree, in violation of G.L. 1956 § 11-23-1; one count of assault with intent to commit murder, in violation of G.L. 1956 § 11-5-1; one count of "discharg[ing] a firearm while committing a crime of violence, to wit, murder, resulting in the death of Carl Cunningham, Jr.," in violation of G.L. 1956 § 11-47-3.2; and one count of "discharg[ing] a firearm while committing a crime of violence, to wit, assault with intent to commit murder," in violation of § 11-47-3.2. On appeal, Mr. Gonzalez contends that the trial justice erred in failing to grant his motion to suppress certain evidence that was obtained as a result of his warrantless arrest in his home. He specifically posits that "neither exigent circumstances nor consent justified the failure of [the] * * * police to obtain a warrant * * *." Mr. Gonzalez also argues on appeal that the trial justice erred in failing to "remove two biased jurors" from the jury or, in the alternative, grant a mistrial.

- 1 -

For the reasons set forth in this opinion, we vacate the judgment of the Superior Court and remand the case for a new trial.

# I

## Facts and Travel

On May 22, 2012, a Kent County grand jury indicted Mr. Gonzalez on the aforementioned four charges: one count of first-degree murder; one count of assault with an intent to commit murder; one count of discharging a firearm while committing a crime of violence, to wit, murder; and one count of discharging a firearm while committing a crime of violence, to wit, assault with an intent to commit murder. The charges against defendant arose out of a shooting which caused the death of Carl Cunningham, Jr. In order to provide some preliminary orientation with respect to the factual and legal matters that are addressed in the following pages, we begin by simply noting that it is undisputed that Mr. Cunningham was shot to death in January of 2012 in a home on Nausaucket Road in Warwick, Rhode Island, and that Patricia Dalomba and Matthew Chivers were also present in that home at the time of the shooting.[1] The police quickly had ample reason to suspect that defendant, Tony Gonzalez, was the person who had shot Mr. Cunningham.

Immediately preceding the start of defendant's jury trial, a hearing was held regarding defendant's motion to suppress. On appeal, he alleges that the following should have been suppressed: (1) his statement regarding the location of the gun which the police were asking him about during the course of his arrest; and (2) certain evidence derived from the search of his

---

[1] According to the testimony of Officer Stephen Major at trial, Mr. Cunningham died at 12:33 a.m. on January 22, 2012. Mr. Cunningham's death was caused by a shooting which occurred shortly before midnight on January 21, 2012.

residence following his arrest.[2]  We relate below, in pertinent part, what occurred at the motion to suppress hearing.

A

**The Hearing on Defendant's Motion to Suppress**

The basis of defendant's motion to suppress was his contention that his arrest was unlawful because the police did not have a warrant to enter his home and arrest him.  The parties do not dispute the fact that the police did not have either an arrest warrant or a search warrant when they entered defendant's home and arrested him.

**1.  The Testimony of Detective Thomas Digregorio**

Detective Thomas Digregorio testified that he was employed by the Warwick Police Department on the date in question.  He stated that his involvement with the instant case began when he was "called in on the investigation" in the early morning hours of January 22, 2012.  He further testified that, shortly after being called in, he and Det. Timothy Grant interviewed Matthew Chivers, who was present during the shooting of Carl Cunningham, Jr., which shooting had occurred around midnight.  The following is the information which Det. Digregorio stated was provided by Mr. Chivers:

> "He told us that he had been dating a woman who lives at that house where the homicide occurred name Patricia Dalomba; that he had been dating her approximately the past month, since December of 2011. He stated that about three days prior he had spoken with Patricia's ex-boyfriend on the phone. According to Mr. Chivers, Patricia was getting harassing phone calls and texts from her ex-boyfriend who's [sic] name was Tony. He didn't know Tony's last name. He said that about three days prior to us speaking to him he talked to Tony on the phone after he, Tony had

---

[2]      The specific items discovered during the search which defendant contends should have been suppressed are: "a black Taurus handgun case, a 9 mm magazine, receipt for a gun purchase from D&L gun store, a black bubble vest, [gray] Timberland boots, a black jacket, and a multi-colored scarf."

- 3 -

called Patricia, and he told Tony that in no uncertain terms to stop calling and texting her and harassing her. * * * The afternoon prior [to the murder], Mr. Chivers received a phone call from Tony Gonzalez stating that he was going to catch him sleeping, and he took that as a threat. * * * [H]e also stated that Tony * * * had come to the house to fight him at about midnight that night."

Detective Digregorio went on to state that the investigation quickly revealed that Tony Gonzalez had entered Ms. Dalomba's house and fired several shots, striking Mr. Cunningham, who happened to be in the house along with Mr. Chivers and Ms. Dalomba. Mr. Cunningham was killed as a result of the shooting.

It was Det. Digregorio's testimony that he and Det. Grant "went to a couple of locations in Providence in order to try to locate the defendant because he was on the run at that point and [they] were afraid of destruction of evidence, but also [they] were afraid that given the fact that he was armed and dangerous, that he might be a threat to others * * *." He proceeded to state that, when defendant was eventually located at his home in Providence, he and Det. Grant met up with Providence police officers and other detectives from the Warwick Police Department at Providence Police Substation 7, from which location the group of law enforcement officers all proceeded to defendant's apartment. Detective Digregorio then testified that, after defendant's arrest in his apartment, defendant's mother, Cira Gonzalez, gave written consent to a search of the apartment at 8:10 a.m. on January 22, 2012; he added that she was calm at the time she gave consent.

On cross-examination, Det. Digregorio was specifically asked why the police did not obtain an arrest warrant to arrest Mr. Gonzalez and he replied:

> "We went to Mr. Gonzalez's house about seven hours after the murder had occurred. Being involved in several homicides and being the case agent on at least two of them, I know that things evolve quickly and everybody doesn't have full information * * *. In this case we had a homicide that occurred in the city of

- 4 -

Warwick where there's a fugitive on the loose that's armed. We try to track that individual and ultimately did to prevent any further loss of life, including his. Sometimes people that murder take their own lives. We also try to prevent any destruction of evidence. All those things happen very quickly, and given the facts and circumstances I feel it was the right thing to do. There wasn't time. Time was of the essence at that point. * * * We were trying to track down Mr. Gonzalez to try and prevent a violent fugitive who was armed, who might be a danger to himself and others, and who might be trying to get rid of evidence. To sit down at a desk and type out a warrant at that point in time to me was a waste of resources, in my opinion."

## 2. The Testimony of Detective Timothy Grant

Detective Timothy Grant was a detective in the Warwick Police Department on January 22, 2012. Detective Grant testified that, "shortly after one o'clock in the morning" on that date, he was "advised to come back to work to assist * * * in a homicide investigation." According to his testimony, it had been shortly after midnight that the Warwick Police Department "got the call" about the homicide. Detective Grant then testified that, when he arrived at the station, he was told that a man named "Tony Gonzalez" had "shot and killed an individual named Carl Cunningham." Detective Grant stated that, later that morning, he and Det. Digregorio were following some leads in Providence when they received a phone call from Detective Sergeant LeBlanc "indicating that the Defendant may be at his mother's address [(where defendant was also living)] in the Chad Brown housing complex" in Providence. According to Det. Grant, Det. Sgt. LeBlanc indicated that he had come by that information "through a controlled phone call with the Defendant's brother," Juan Zachary Garcia.[3]

---

[3] Detective Timothy Grant explained that the "controlled call" which he referenced was a phone call made by defendant's brother to defendant with Det. Eric Johnson and another uniformed officer present. According to Det. Grant's testimony, it was during that phone call that the officers learned that defendant was at his mother's apartment. On redirect examination, Det. John McHale of the Warwick Police Department (see Part I.A.4 infra) testified with respect

It was the further testimony of Det. Grant that he and Det. Digregorio arrived at Providence Police Substation 7 "shortly before 7:00 a.m." on January 22. He added that they "waited for additional Warwick personnel to arrive * * *." He next testified that Warwick and Providence officers subsequently "took a caravan"[4] to 48 June Street, Apartment J in Providence—defendant's mother's apartment, where defendant was living; Det. Grant added that the officers set up a perimeter around the apartment.

It was subsequently Det. Grant's testimony that, before the police set up the perimeter, they had received information from defendant's brother that defendant "typically [slept] with a handgun under his pillow." From Det. Grant's perspective, that fact created a "huge officer safety issue;" he added that the police had additional concerns about officer safety due to the nature of the crime that defendant was suspected of having committed. Moreover, Det. Grant stated that the police were concerned about the destruction of evidence, and he also said that they had been told, by the mother of Patricia Dalomba, that in the latter's conversations with defendant he had acknowledged that he owned a firearm, carried a firearm, and liked to shoot at the range.

Detective Grant's testimony then returned to the arrest of defendant. He testified that he observed a woman answer the door to the apartment, which woman was "later identified as the Defendant's mother, Cira Gonzalez;" he added that she "exchange[d] words" with an officer and "allowed an entrance into the house," but Det. Grant acknowledged that he did not hear the "exact conversation." On cross-examination, Det. Grant stated that the time between Ms.

---

to the timing of the "controlled call," stating that it took place "in the area of 6, 6:15" in the morning.

[4]     Detective Grant testified on cross-examination that the caravan consisted of three "marked cruisers" and a "couple of detective units."

Gonzalez opening the door of the apartment and the officers entering the apartment was "ten, fifteen seconds."

It was Det. Grant's further testimony that he then entered the house behind members of the Providence Police Department; he stated that about six officers entered before him. According to his testimony, he then proceeded to ascend the stairs and saw "Providence Police officers with a subject on the ground attempting to handcuff him." He also testified that the officers arresting defendant were asking him, even before he was handcuffed and the arrest was effectuated, where his firearm was and that defendant stated in response: "'It's not here.'"

Detective Grant added that he was later informed that consent to search the premises had been granted by both defendant and defendant's mother. He testified that he proceeded to search defendant's bedroom, adding that that search resulted in the discovery of a black vest, a black jacket, and a black scarf—which items were consistent with "what [he] knew to be the items that Defendant wore on the previous evening of the shooting."

### 3. The Testimony of Officer Joseph Dosreis

Officer Joseph Dosreis testified that, as of the time of trial, he had been a patrol officer with the Providence Police Department for over seventeen years. He proceeded to testify that, on January 22, 2012, he met Warwick detectives at a Providence substation "in regards to an ongoing search for a wanted subject." According to his testimony, he was told by other police officers that the suspect "should be" in possession of a weapon and "maybe [sic] in his bedroom sleeping with his weapon under his pillow."

The further testimony of Officer Dosreis indicated that a little after 7:00 a.m. he drove to defendant's residence in a marked police car, in uniform, wearing a bulletproof vest, and "assum[ed] [his] position[]" at the front door to the apartment; he added that a "couple of

officers" were behind him. He further testified that his firearm was holstered but that the other officers behind him had their firearms "displayed." Officer Dosreis added that, in entering the apartment and effectuating the arrest of defendant, he used a "tactical shield," which he described as a "protective shield similar to that of a riot type shield * * * extending your body armor."

According to Officer Dosreis's testimony, he proceeded to knock on the front door and was asked who it was, to which he responded "'Providence Police;'" he stated that the door was subsequently opened by a middle-aged, Hispanic female. Officer Dosreis testified that he identified himself again and twice asked for information regarding "where Tony was." He testified that, out of concern for his own safety, it was a hurried conversation; he said, however, that, despite it being a hurried conversation, he and the woman "had eye contact." He stated: "I asked for Tony, where is he, where is he. And I was under the impression that he would be up in the bedroom so I looked and she looked up toward the stairs * * *." He further testified that the woman "indicated with her eyes and gestured toward the top of the stairs." He added that he then entered the apartment and proceeded to "sprint" up the stairs while loudly identifying himself. It was his testimony that once upstairs he saw a man fitting the description of defendant, whom he "shoved to the ground, with the use of the shield." He added, on cross-examination, that he had his gun drawn at the time he "sprint[ed]" up the stairs.

Officer Dosreis's testimony indicated that, once he had defendant on the ground and was attempting to handcuff him, he asked repeatedly where the gun was, to which defendant responded: "'It's not here. It's not in the bedroom. I don't have a gun.'"

#### 4.   The Testimony of Detective John McHale

Detective John McHale testified next.  He stated that he was an officer in the Warwick Police Department.  According to his testimony, on the morning of January 22, 2012, he and Detective Joseph Mee "spoke with" Patricia Dalomba for about an hour and a half, beginning at 1:30 a.m.  He testified that she identified the shooter as Tony Gonzalez, her ex-boyfriend, whom she still saw on a regular basis; he added that she stated that Mr. Gonzalez was known to carry a black nine millimeter handgun "everywhere he goes."

Detective McHale further testified that, after defendant was arrested, he and Patrolman Greg Johnson transported defendant from the apartment to the police station.  He stated that, during that drive, they pulled the police cruiser over in a parking lot and Patrolman Johnson read a "consent to search form" to defendant through the open back door of the police cruiser.  He further testified that Mr. Gonzalez was uncuffed and was "afforded the opportunity" to read the form.  According to Det. McHale's testimony, after reading the form, Mr. Gonzalez ultimately signed it.  He added that defendant did not appear to be under the influence of any drugs or alcohol at the time he signed the consent to search form.

On cross-examination, Det. McHale testified that the police did not get a warrant to arrest defendant because they knew he had "shot Carl Cunningham several times, had a weapon that he carries all the time, and you don't know what the person's going to do once they leave with that weapon. They could have got rid of the weapon, hurt someone else, or [himself]. * * * Time is of the essence."  On redirect examination, he added that the police had to act quickly in arresting defendant because the controlled call "informed" defendant that the police were looking for him.

## 5. The Testimony of Detective Joseph Mee

Detective Joseph Mee testified that, at the time of trial, he had been with the Warwick Police Department for approximately ten years. He testified that, when he was called into work approximately sixteen minutes after midnight on the morning of January 22, 2012, he was told about the shooting death of Carl Cunningham, Jr. on Nausaucket Road in Warwick; he added the following:

> "What we were told was that the suspect, Tony Gonzalez, there was some back and forth with text messaging and phone calls in relation to him and Matt Chivers possibly getting into some type of fight. Tony Gonzalez shows up at the house shortly before midnight, wanted to fight with Matt Chivers. Matt Chivers was inside the residence looking out the window. He saw a couple of vehicles drive by, saw figures walking up the driveway. He returned to the back bedroom where he met with Patricia Dalomba. A short time later Cunningham, who was on the couch, had made his way back to the rear bedroom and the three of them were in the bedroom when Tony Gonzalez, the suspect, entered the residence, made his way back to the back bedroom, obviously without consent, and began shooting inside the residence in the back bedroom."

It was Det. Mee's testimony that he and Det. McHale then conducted an interview at the police station with Patricia Dalomba; he added that she told him that Mr. Gonzalez carried a gun "pretty much on an everyday basis." It was also his testimony that Ms. Dalomba not only witnessed the shooting but also saw defendant leave her house after the shooting and enter a vehicle. On cross-examination, Det. Mee indicated that he had learned from other detectives that Mr. Chivers was in the closet at the time of the shooting, making Ms. Dalomba the only eyewitness.

It was Det. Mee's further testimony that, after defendant was arrested, defendant's mother brought clothes downstairs for him to wear while being taken to the police station and that the gray boots which she brought were "something that was described by Patricia Dalomba" as the footwear which defendant "had worn the previous evening."

- 10 -

The testimony of Det. Mee then addressed Ms. Gonzalez's consent to search the apartment. He stated that he read the consent to search form to her and allowed her to read it herself. He added that she subsequently signed it and, after learning that Mr. Gonzalez's consent had also been obtained, he proceeded to search Mr. Gonzalez's bedroom. It was his testimony that that search uncovered "an open black gun case," "miscellaneous gun parts," "a magazine which was almost fully loaded," and "a receipt from D & L Gun Store in Warwick, Rhode Island" that reflected the purchase of a "nine millimeter Taurus" (which, according to the detective's testimony, was the type of gun that Ms. Dalomba told him Mr. Gonzalez customarily carried). Additionally, he stated that during the search of defendant's bedroom the police seized "a bubble vest," "a black and blue and white scarf," and "a black jacket;" he stated that they also seized the gray boots Ms. Gonzalez had brought downstairs for her son to wear. According to Det. Mee, all of those items matched Ms. Dalomba's description of what Mr. Gonzalez had been wearing during the shooting.

### 6. The Testimony of Cira Gonzalez

Cira Gonzalez testified that she is defendant's mother and that defendant was living with her at 48 June Street in Providence at the time of his arrest. She testified that, when she opened the door for the police on January 22, 2012, she "saw a whole bunch of cops with shields and guns;"[5] she added that she "didn't say [any]thing." She answered in the affirmative when asked whether or not the officers' guns were drawn. It was her testimony that, when she opened the door, the police "didn't say nothing. They just all pushed me back and they all went upstairs. * * * [T]hey just walked in yelling 'Where's Tony? Where's Tony?'" She stated that,

---

[5] Ms. Gonzalez later clarified that the "whole bunch of cops" she initially saw at the door consisted of three officers.

- 11 -

when she indicated in the direction of the upstairs in response to their question, they were already upstairs.

On cross-examination, Ms. Gonzalez added that she did not hear the police identify themselves before she opened the door to the apartment. She was questioned regarding whether the officers pushed her out of the way when they entered the apartment, and she made the following statement: "I mean, they didn't actually push, you know?" When she was then asked whether the police walked in gently she stated: "Not gently, They just pushed, you know. They walked in, and, you know, I had no other choice but to walk back because they were walking in." She further testified that the police never physically put their hands on her. During the course of cross-examination, Ms. Gonzalez answered in the affirmative when asked if she "pointed" up the stairs in response to the officers asking her the location of her son.

### 7. The Decision of the Trial Justice

Cira Gonzalez was the last witness to testify at the hearing on the motion to suppress. The attorneys were then given an opportunity to argue before the trial justice made his ruling.

The first issue addressed was the statement of defendant regarding the gun not being in the apartment, which he made during his arrest and before he was read his Miranda rights. The trial justice denied the motion to suppress that statement, finding that the question was "prudent" to ask without the "formal advisement of Miranda" given the concern for the police officers' safety and the public safety. He specifically stated that the officer who made the arrest "had every reason to believe that [defendant] was armed."

Defense counsel then addressed the voluntariness of the signing of the consent to search forms by defendant and his mother. With respect to both consents, the trial justice held that there was no evidence that they were coerced. Moreover, he stated that there was no basis for the

- 12 -

suggestion that Mr. Gonzalez's consent was not "free and voluntary." He therefore denied defendant's motion to suppress the evidence on the grounds of lack of consent to search.

Defense counsel then proceeded to argue for suppression of the evidence due to the fact that the police did not have an arrest warrant or a search warrant. The trial justice held that there were exigent circumstances in the case that justified the failure of the police to obtain a warrant. The trial justice stated as follows:

> "It's obvious the Warwick Police Department deployed their resources in several directions. They had investigators work the scene. They also had officers, it sounds to me from the testimony, it's pretty clear, Detective Mee and others were assigned to locate the suspect, interview witnesses. Miss Dalomba and Mr. Chivers were interviewed at the station within an hour after this incident occurred; an hour or more, an hour or two. So, they just weren't all at the scene taking their time taking pictures. That's not the picture I got from the evidence. It's pretty clear to me that these officers within the wee hours of the morning, within hours of the alleged offense having occurred, are in the process of trying to apprehend, chase down a suspect who just killed somebody with a firearm, who, to their knowledge, still has the firearm and who knows what he's up to. They apprehended this fellow at six o'clock in the morning, or seven o'clock in the morning. I think located -- they realized where he was around six o'clock in the morning, and I think the arrest, if my memory serves me right, was somewhere between six and seven in the morning; that being, the June Street apartment of his mother. If those aren't exigent circumstances, I don't know what are."

The trial justice made a further finding to the effect that the officers' initial entrance into the apartment was made with Ms. Gonzalez's consent. He stated that Ms. Gonzalez "maybe felt rushed" but that, despite the lack of verbal permission, she "allowed them to enter." Consequently, he denied defendant's motion to suppress evidence resulting from the arrest and the subsequent search of the apartment.

In due course, a jury trial was held over nine days in February of 2013. We summarize below the salient aspects of what transpired at that trial.

**B**

**The Trial**

Seventeen witnesses testified at defendant's trial. We note that the trial justice did not have the benefit of the testimony and evidence adduced at trial in making his ruling on defendant's motion to suppress, but the testimony and evidence at trial are relevant to our eventual determination as to whether or not the doctrine of harmless error is applicable in the instant case. Accordingly, in reviewing the evidence and testimony admitted during the trial, we shall focus only on what is necessary for our resolution of the issue of the applicability of the harmless error doctrine.

**1. The 911 Call**

At trial, a recording of the 911 call placed by Mr. Chivers and Ms. Dalomba was entered as an exhibit; a transcript of the call was similarly entered as an exhibit. The transcript of the 911 call reflects the fact that, during the course of the call, Mr. Chivers and Ms. Dalomba were asked a number of times who had committed the shooting. Ms. Dalomba identified the shooter as "Tony Gonzalez" several times. In addition, she was asked for and provided Mr. Gonzalez's home address—"48 Jay June Street" in "Providence." She provided that address three times. Moreover, she identified Mr. Gonzalez as being "Spanish," "5 foot 5," and twenty-four or twenty-five years old; and she provided Mr. Gonzalez's date of birth more than once.

**2. The Testimony of Patricia Dalomba**

Ms. Dalomba was one of the witnesses to testify at defendant's trial. In the course of her testimony, she identified defendant as Tony Gonzalez and as the individual who shot Mr. Cunningham. She stated that she was "100 percent" positive and would "bet [her] life on it."

- 14 -

Ms. Dalomba testified that defendant was an ex-boyfriend whom she had dated for several years and had still been seeing on and off until shortly before the night of the shooting. She testified that he was jealous of her relationship with her present love interest, Mr. Chivers; she stated: "[H]e was jealous of me being in a relationship with anyone." According to Ms. Dalomba's testimony, earlier in the evening of January 21, 2012 (the date of the shooting) she and defendant were exchanging text messages, some of which pertained to their relationship and to her new relationship with Mr. Chivers; she added that defendant stated in one of those text messages that he was "thirsty for blood." She also testified that Mr. Chivers and Mr. Gonzalez "traded insults" during a phone conversation around eight o'clock on the same evening. It was her further testimony that, after that phone call, defendant continued to text her, saying that he was "blood thirsty" and that Mr. Chivers is "going to be as heartless as I am." We note that Mr. Chivers testified at trial that there were repeated text messages sent from Mr. Gonzalez to Ms. Dalomba over the course of the evening and that Mr. Gonzalez "didn't like it" when Mr. Chivers told him to leave Ms. Dalomba alone. A redacted copy of the text messages which Ms. Dalomba exchanged with Mr. Gonzalez was admitted as an exhibit at trial, and Ms. Dalomba testified in great detail regarding what was in the text messages.

According to Ms. Dalomba's testimony, the exchange of texts and phone calls among Mr. Gonzalez, Mr. Chivers, and herself culminated in Mr. Gonzalez stating that he was coming to her house (where she, Mr. Chivers, and Mr. Cunningham were located) in "ten to twelve minutes." She further testified that, when Mr. Gonzalez arrived at her house, he was wearing "a black jacket like I think it was a bubble vest type jacket." She added: "He had on a scarf that he had just recently bought, like a black and blue. I believe he had gray boots on." She also testified that he was wearing "black jeans" and that she had seen the scarf he was wearing "a bunch of

times." Later in her testimony, she stated that she went to the police station on January 22, after Mr. Gonzalez's arrest, and identified the clothes seized from his apartment as the clothes he had been wearing during the shooting.

Ms. Dalomba stated that, when Mr. Gonzalez arrived at her house, she initially opened the front door and spoke to him; she added that she then shut the front door, retreating into the bedroom where Mr. Chivers and Mr. Cunningham were located. She further testified that Mr. Gonzalez then pushed his way into her bedroom with his gun drawn saying, "'I got something for you. I got something for you'" and "laughing like a jeckyll [sic]." She stated that, at that point, Mr. Gonzalez had his scarf "wrapped around his mouth and over his head." She described the gun he used as black with a six to seven inch barrel. It was also her testimony that, when Mr. Gonzalez entered the bedroom, he "pushed" her into a "pantry area" and she "started to hear gunshots." She stated that she witnessed Mr. Gonzalez shooting in the bedroom; and she testified that, as he fled, he told her, "'Your boys are dead.'"

### 3. The Testimony of the Police

With the exception of Officer Dosreis, all of the police officers and detectives who testified at the hearing on the motion to suppress also testified at trial. During the course of Det. Grant's testimony, the gun case which was seized from the foot of defendant's bed was entered as an exhibit; according to Det. Grant's testimony, the gun case contained "a magazine for a nine millimeter handgun, with bullets," "grips for a handgun," an "owner's manual," and "a receipt." Detective Grant also testified that Mr. Gonzalez's name was on the receipt, which referenced the sale of a "Taurus nine millimeter, black."[6] Detective Grant's testimony also indicated that, in addition to the evidence which defendant argues on appeal should not have been admitted at his

---

[6] The actual firearm used in the shooting was never located.

- 16 -

trial, a cell phone was also seized during the search of defendant's bedroom. The cell phone, the vest, the scarf, and the jacket were admitted as exhibits, and Det. Grant testified that they were consistent with Ms. Dalomba's "description of what * * * defendant wore the evening of the shooting."

Detective Eric Johnson of the Warwick Police Department also testified. During his testimony, a redacted copy of the record of the incoming and outgoing calls on Mr. Gonzalez's cell phone from the night in question was entered as an exhibit, and it reflected numerous calls between Mr. Gonzalez and Ms. Dalomba on the day of the shooting.

Later in the trial, Det. McHale testified that the police identified the gray boots which it was alleged Mr. Gonzalez wore at the time of the shooting while the boots were still at his house; and the boots were not entered as an exhibit. He also testified that Ms. Dalomba had identified the vest, jacket, jeans, and scarf as being items which Mr. Gonzalez was "wearing the night the incident occurred."

#### 4.  The Testimony of Michael Noth

Michael Noth testified at the trial that he knew Mr. Gonzalez from high school and had been friends with him "on and off" since high school. He further testified that, on the night of January 21, 2012, he picked up defendant "sometime around 11:30" p.m. and Mr. Gonzalez told him he needed to make a "quick" trip to Warwick in order to "sell [marijuana]." Mr. Noth testified that Mr. Gonzalez directed him to a house in Warwick; the description of the house which Mr. Noth provided in his testimony was consistent with Ms. Dalomba's testimony regarding the fact that her home was situated behind another home. Mr. Noth proceeded to state that he dropped Mr. Gonzalez off, "drove up the street and did a U-turn," and then came back and parked in front of the place where he had dropped off Mr. Gonzalez. He testified to "playing

- 17 -

with [his] phone for a little bit;" he said that then he observed Mr. Gonzalez "walking up * * * the driveway, and he hopped [into the car] and then [they] left." Mr. Noth added that that took place around "11:50, 12 o'clock." Mr. Noth further testified that, on the night in question, defendant was wearing a "black bubble vest."

### 5. The Testimony of Jimmie Lee Hutchins

Jimmie Lee Hutchins was the last witness to testify at the trial. He testified that he was an ex-boyfriend of Ms. Dalomba. He also stated that Mr. Cunningham was "one of [his] best friends." It was also his testimony that he knew defendant.

Mr. Hutchins stated that, during the course of being transported from the Adult Correctional Institutions (ACI) to court on Friday, February 1, 2013, he was in a "holding tank" at the ACI with Mr. Gonzalez. He testified that he asked Mr. Gonzalez why he had shot Mr. Cunningham. It was Mr. Hutchins's testimony that Mr. Gonzalez "smiled" and "laughed" and that "all he would say was, 'you know what that * * * b**** did to our heads.'" According to Mr. Hutchins, it was his understanding that Mr. Gonzalez was referring to Ms. Dalomba. Mr. Hutchins added that Mr. Gonzalez then asked how Mr. Cunningham's parents "were doing;" Mr. Hutchins stated that he had responded: "'How the f*** do you think they're feeling? You killed their son.'" It was the further testimony of Mr. Hutchins that Mr. Gonzalez, referring to himself and Mr. Cunningham, responded: "'You know how we were. We used to sit on the couch playing video games.'" Mr. Hutchins proceeded to testify that he asked Mr. Gonzalez why he continued shooting if he knew it was Mr. Cunningham that he was shooting. Mr. Hutchins stated that, in response, defendant "laughed, shook his head, and that was the point where he just didn't say anything anymore. He just wouldn't give me an answer. He just laughed about it."

### 6. Closing Argument

Following Mr. Hutchins's testimony, the state rested. The defense then rested without presenting any witnesses. During the prosecutor's closing argument, she discussed Ms. Dalomba's credibility and stated that "her testimony, the accounts of what happened, that she gave on that stand is corroborated by the physical evidence that was obtained in this particular case." She added that Ms. Dalomba told the jury "what the defendant was wearing" and specifically discussed the fact that Ms. Dalomba had identified the scarf which defendant was wearing the night of the shooting. She added that that same scarf was in a picture Ms. Dalomba took with defendant shortly before the shooting. The prosecutor also specifically referenced the gun box, the manual, the magazine, and the receipt for the gun purchase. Additionally, she noted that the only thing that defendant "[had to] say" when he was arrested at his residence the morning after the shooting was that the gun was not there. She referenced defendant's statement that the gun was not at the apartment twice before concluding her argument by urging the jury to find defendant guilty of all of the counts on which he had been charged.

At the conclusion of the trial, the jury found defendant guilty on all counts, and he was sentenced as follows: (1) life on Count One—murder in the first degree; (2) twenty years, fifteen to serve, five years suspended and five years probation (to be served consecutively to the sentences on Counts One and Three) on Count Two—assault with intent to commit murder; (3) life (to be served consecutively to the sentence on Count One) on Count Three—discharge of a firearm while committing a murder; and (4) ten years suspended and ten years probation (to be served consecutively to the sentences on all of the other counts) on Count Four—discharge of a firearm while committing an assault with an intent to commit murder. The defendant filed a timely appeal of his conviction.

# II

## Analysis

### A

### Motion to Suppress

#### 1. Standard of Review

We have previously stated that, in reviewing a trial justice's denial of a defendant's motion to suppress evidence, "we defer to the factual findings of the trial justice, applying a clearly erroneous standard." State v. Patino, 93 A.3d 40, 50 (R.I. 2014), cert. denied, 135 S. Ct. 947 (2015) (mem.) (internal quotation marks omitted); see State v. Cosme, 57 A.3d 295, 299 (R.I. 2012); see also State v. Page, 709 A.2d 1042, 1044 (R.I. 1998). However, when this Court reviews "an alleged violation of a defendant's constitutional rights, this Court must make an independent examination of the record to determine if [the defendant's] rights have been violated." State v. Harrison, 66 A.3d 432, 441 (R.I. 2013) (quoting State v. Goulet, 21 A.3d 302, 311 (R.I. 2011)). Moreover, when performing this independent examination, this Court must "view the evidence in the record in the light most favorable to the state." Id. (internal quotation marks omitted). As such, we will reverse a trial justice's findings on a motion to suppress only if "(1) his or her findings concerning the challenged statements reveal clear error, and (2) our independent review of the conclusions drawn from the historical facts establishes that the defendant's federal constitutional rights were denied." State v. Grayhurst, 852 A.2d 491, 513 (R.I. 2004) (internal quotation marks omitted).

When dealing with "questions of law and mixed questions of law and fact involving constitutional issues," we conduct a "de novo review," in accordance with Ornelas v. United States, 517 U.S. 690, 697-98 (1996). State v. Linde, 876 A.2d 1115, 1124 (R.I. 2005) (quoting

State v. Apalakis, 797 A.2d 440, 443 (R.I. 2002)); see State v. Jimenez, 33 A.3d 724, 732 (R.I. 2011); State v. Barkmeyer, 949 A.2d 984, 995 (R.I. 2008).

## 2. Discussion

> "The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!" Miller v. United States, 357 U.S. 301, 307 (1958) (quoting "[r]emarks attributed to William Pitt, Earl of Chatham, on the occasion of debate in Parliament on the searches incident to the enforcement of an excise on cider").[7]

The protected status of one's cottage of which William Pitt spoke so eloquently was elevated to a constitutional right by this country's adoption of the Fourth Amendment to the United States Constitution. An individual's right to privacy in his home is rooted in the clear language of the Fourth Amendment: "The right of the people to be secure in their * * * houses * * * shall not be violated * * *." U.S. Const. Amend. IV; see Payton v. New York, 445 U.S. 573, 589 (1980); see also Welsh v. Wisconsin, 466 U.S. 740, 748 (1984) ("It is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.") (internal quotation marks omitted). As Justice Jackson observed:

> "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw

---

[7] The United States Supreme Court provided the following with respect to the source of the quotation from William Pitt:

> "The Oxford Dictionary of Quotations (2d ed. 1953), 379. In Hansard, Parliamentary History of England (1813), vol. 15, column 1307, under the proceedings in the Commons on the cider tax in March, 1763, we find: 'Mr. Pitt spoke against this measure, particularly against the dangerous precedent of admitting the officers of excise into private houses. Every man's house was his castle, he said.'" Miller v. United States, 357 U.S. 301, 307 (1958).

from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. * * * When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman * * *." Johnson v. United States, 333 U.S. 10, 13-14 (1948) (footnotes omitted).

In expounding on that principle, the Supreme Court has unequivocally stated that "[i]n terms that apply equally to seizures of * * * persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstance, that threshold may not reasonably be crossed without a warrant." Payton, 445 U.S. at 590. Therefore, "searches and seizures inside a home without a warrant are presumptively unreasonable."[8] Id. at 586. Moreover, this Court has recognized that fundamental principle, stating that "[t]he Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." Linde, 876 A.2d at 1124 (quoting Illinois v. Rodriguez, 497 U.S. 177, 181 (1990)).

Since it is conceded in the instant case that the police entered defendant's residence without a search warrant or an arrest warrant,[9] in order for the arrest and the subsequent search to have been lawful, one of the few "narrowly defined and jealously guarded" exceptions to the warrant requirement must apply. State v. Beaumier, 480 A.2d 1367, 1373 (R.I. 1984).[10] The

---

[8] The same rules which apply to the seizure of property inside of a home also apply to the arrest of an individual inside his home; "the warrantless arrest of a person is a species of seizure required by the [Fourth] Amendment to be reasonable." Payton v. New York, 445 U.S. 573, 585 (1980).

[9] We note that the officers needed to have obtained only an arrest warrant for Mr. Gonzalez and not a search warrant for the apartment because, "[i]f there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law." Payton, 445 U.S. at 602-03; see also State v. O'Dell, 576 A.2d 425, 427 (R.I. 1990).

[10] State v. Beaumier, 480 A.2d 1367 (R.I. 1984), was overruled on other grounds by State v. Rios, 702 A.2d 889, 889-90 (R.I. 1997).

state argues that this case falls within two exceptions to the warrant requirement; it contends: (1) that the entry to the home was consented to; and (2) that there were exigent circumstances present which justified a warrantless entry. See Duquette v. Godbout, 471 A.2d 1359, 1362 (R.I. 1984); see also State v. Portes, 840 A.2d 1131, 1136 (R.I. 2004); State v. Bailey, 417 A.2d 915, 918 (R.I. 1980). We shall address each of the invoked exceptions in turn.

### a. Consent

It is important to note, initially, that defendant does not dispute the principle that a cohabitant, in this case defendant's mother, may consent to the entry of police into the home they share. See State v. Hightower, 661 A.2d 948, 960 (R.I. 1995) (stating that "any coinhabitant could validly give consent to search premises shared by another person") (citing United States v. Matlock, 415 U.S. 164, 171 (1974)). Therefore, we must focus on whether or not Ms. Gonzalez's conduct when the police came to her door on the morning of January 22, 2012 constituted legally sufficient consent to enter the apartment.

Consent is "[o]ne of the specifically established exceptions to the requirement[] of * * * a warrant * * *." Linde, 876 A.2d at 1125 (internal quotation marks omitted). However, "[w]hen seeking to justify a search or seizure on consent grounds, the state must prove that the consent was 'freely and voluntarily given.'" Bailey, 417 A.2d at 918 (quoting Bumper v. North Carolina, 391 U.S. 543, 548 (1968)). In the Fourth Amendment context, the state must prove by a "fair preponderance of the evidence" that there was free and voluntary consent. State v. O'Dell, 576 A.2d 425, 427 (R.I. 1990); see United States v. Diaz, 494 F.3d 221, 225 (1st Cir. 2007); Barkmeyer, 949 A.2d at 997. Moreover, we have followed established United States Supreme Court precedent in stating that "the question of whether consent was 'in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the

- 23 -

totality of all the circumstances.'" Palmigiano v. Mullen, 119 R.I. 363, 370, 377 A.2d 242, 246 (1977) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)). Consequently, "[n]o single criterion is the determinative factor" in deciding whether or not there was free and voluntary consent. Beaumier, 480 A.2d at 1374.

Due to the fact that the determination of the voluntariness (vel non) of consent is a factual finding, it is "accorded deference and is disturbed only if it is clearly erroneous." Barkmeyer, 949 A.2d at 995; see Patino, 93 A.3d at 50. In the past, we have adopted the language of the United States Court of Appeals for the First Circuit in stating that "[t]he operative inquiry is whether the evidence presented at the suppression hearing fairly supports the court's finding with respect to voluntary consent." Barkmeyer, 949 A.2d at 995 (quoting United States v. Romain, 393 F.3d 63, 69 (1st Cir. 2004)).

**i. The Purported Consent of Ms. Gonzalez to the Entry of Officers into her Apartment**

In the instant case, the trial justice found that Ms. Gonzalez consented to the entry of police into her home because he believed, based on the testimony at the suppression hearing, that Ms. Gonzalez allowed the police to enter. The defendant contends that that decision was in error because the consent exception to the warrant requirement did not apply in this case; he posits that the purported consent by his mother was not voluntarily and freely given, but was a "[m]ere acquiescence." After a very thorough review of the testimony elicited at the motion to suppress hearing, and even after considering the evidence in the light most favorable to the state, we are unable to perceive sufficient evidence to permit us to uphold the trial justice's conclusion that Ms. Gonzalez provided free and voluntary consent. See Harrison, 66 A.3d at 441.

The testimony of Officer Dosreis, who led the group of policemen who entered the apartment, reveals that he asked Ms. Gonzalez "where Tony was;" but his testimony did not

reflect that she said anything in response. He testified that she merely "indicated" with her eyes up the stairs. Officer Dosreis did also answer in the affirmative to a later question as to whether or not Ms. Gonzalez gestured towards the stairs. However, the just-summarized testimony simply is not sufficient evidence upon which to base a finding that Ms. Gonzalez made a free and voluntary choice to allow the police to enter the apartment; in truth, it would not even be a sufficient basis for concluding that her gesture and her indication with her eyes was anything more than a reflexive reaction to Officer Dosreis looking up the stairs. Consent is not voluntary when it is a "mere acquiescence in a show of authority." United States v. Moreno, 701 F.3d 64, 76 (2d Cir. 2012) (internal quotation marks omitted).

We are well aware that consent to search can be conveyed nonverbally. See, e.g., United States v. Walls, 225 F.3d 858, 862-63 (7th Cir. 2000) (determining that there was implied consent when an individual opened the door and then stepped back to allow the police to enter); United States v. Gordon, 173 F.3d 761, 766 (10th Cir. 1999) (holding that there was consent to search when, in response to a request by police to open a bag, the defendant removed the key from his pocket and handed it to the police). However, implied consent must still meet the requirement of being free and voluntary. We have stated that, in making that determination, some of the factors that other courts have considered, and which are appropriately weighed in a review of the totality of the circumstances, include "the number of officers entering the home," "the apprehension of a family member," "the time of day," and a "display of weaponry." Beaumier, 480 A.2d at 1374; see 68 Am. Jur. 2d Searches and Seizures § 151 at 293 (2010) ("a display of weapons in the course of an arrest may be a significant indicator of a coerced consent").

It is very important to note that, in the instant case, it was not simply a single uniformed policeman who knocked on Ms. Gonzalez's door—it was a group of at least three, possibly six, officers. The first officer was carrying a tactical shield held in front of him, and the officers directly behind him were standing at the door to Ms. Gonzalez's apartment with their guns "displayed." While those facts alone are not determinative, Officer Dosreis himself candidly acknowledged that the conversation between Ms. Gonzalez and him was hurried, and Det. Grant testified with similar candor that only ten or fifteen seconds elapsed between the door being opened by Ms. Gonzalez and the officers entering the apartment. Additionally, the officers were at the apartment at around seven o'clock on a Sunday morning, demanding the location of Ms. Gonzalez's son, whom they subsequently arrested. In our judgment, these are hardly circumstances conducive to a voluntary consent.

In State v. O'Dell, 576 A.2d 425, 427 (R.I. 1990), this Court held that Nancy O'Dell's actions in offering the police the keys to a house which she owned and in which her son was hiding and explicitly authorizing them to enter and search for her son clearly established by a preponderance of the evidence that the consent was free and voluntary. When the instant case is juxtaposed with O'Dell, it becomes even clearer that here there was no free and voluntary consent. Indeed, we do not consider it plausible to contend that a woman who was faced with multiple officers with their weapons drawn—one of whom was holding a tactical shield—at around seven o'clock in the morning was totally communicating a free and voluntary decision to consent to an entry into her home when she, at most, glanced up the stairs and/or gestured towards the stairs in response to the officer's question as to the location of her son; in our judgment, a reasonable person confronted with a similar situation would not believe that he or she had been given the opportunity to give free and voluntary consent.

Accordingly, considering the totality of the circumstances, it is our opinion that there was insufficient evidence to support the finding that Ms. Gonzalez freely and voluntarily consented to the entry of the police into her apartment. See Barkmeyer, 949 A.2d at 995; Bailey, 417 A.2d at 918; Palmigiano, 119 R.I. at 370, 377 A.2d at 246. The state certainly did not meet its burden of so proving by a preponderance of the evidence. See O'Dell, 576 A.2d at 427. As a result, based on our review of the evidence and relevant case law, we hold that the trial justice's determination that Ms. Gonzalez consented to the entry of the police into her apartment was clearly erroneous. See Patino, 93 A.3d at 50.

### ii. Ms. Gonzalez's Written Consent to Search the Apartment

We must also assess whether Ms. Gonzalez's later written consent to the search of the apartment was free and voluntary. See Barkmeyer, 949 A.2d at 995. The trial justice held that there was no evidence that Ms. Gonzalez was coerced into giving her written consent to search and that there was no basis for a finding that that consent was other than free and voluntary. However, after careful reflection, we find ourselves unable to agree with that conclusion. It is our opinion that the trial justice clearly erred in so concluding—because we are unable to perceive enough evidence in the record on which to base a determination that the state met its burden of proving that Ms. Gonzalez's consent was free and voluntary by a fair preponderance of the evidence. See O'Dell, 576 A.2d at 427.

In conducting our review of this issue, we have remained especially cognizant of the experience of Ms. Gonzalez from the time when she opened her door at around 7:00 a.m. and the time when she signed the written consent to search, which Det. Digregorio testified was at 8:10 a.m. On that morning, she opened the door to numerous police officers, one holding a tactical shield and the others with their guns drawn, and she was asked, repeatedly, where her son was.

According to the testimony of Officer Grant, it was only ten to fifteen seconds between the door opening and the officers' entry into the home. The officers then proceeded to "sprint" up the stairs and arrest her son. Soon thereafter the police took her son from the house to the police station. She was then asked to give her consent to a search of the apartment. We emphasize the relatively short amount of time under these circumstances that elapsed between the initial opening of the door and the written consent.

It is also important to note that, when Ms. Gonzalez was asked to provide her written consent to search, there were still several officers in her home. Detective Digregorio did testify that Ms. Gonzalez was calm when she consented, but he also stated as follows:

> "[S]he did go through a range of emotions when we were [in her home]. She was generally calm, welcoming of us, but she was also at several points crying because of the fact that her son was being accused of this crime."

Detective Mee testified that he read the consent form to Ms. Gonzalez and allowed her to read it herself before she signed it. However, importantly, he also stated the following with regard to his conversation with Ms. Gonzalez regarding the consent to search:

> "Just explained to her that, you know, based on the circumstances how we would do it is we basically go out and apply for a search warrant, which would mean that an officer or two would wind up staying at the house to make sure that no evidence is, you know, brought out or taken in. While that was done we'd probably respond back to the Warwick Police Department, type out a search warrant. We'd have to contact a judge or magistrate in the city of Providence, have them review it, the search warrant signed, and wind up coming back and searching the residence."

His testimony then reflected the fact that he offered signing the consent to search form to Ms. Gonzalez as a second "option[]." It is clear to us, after an independent examination of the record, that the evidence presented at the suppression hearing was not sufficient to show, by a fair preponderance of the evidence, that there was no duress, either express or implied, which

affected Ms. Gonzalez's signing of the consent to search form in view of the events which preceded that consent. See Barkmeyer, 949 A.2d at 995; Palmigiano, 119 R.I. at 370, 377 A.2d at 246. Consequently, we hold that her consent to search the apartment was not free and voluntary and that the trial justice committed clear error in holding to the contrary. See Barkmeyer, 949 A.2d at 995.

### b. Exigent Circumstances

The defendant contends on appeal that exigent circumstances did not exist in this case because of the amount of time that had elapsed between the point when the police knew the identity of the individual who allegedly committed the shooting and the moment of his eventual arrest. The state responds that it could not be reasonably argued that, in an ongoing manhunt, the police should have interrupted their investigation in the field to attempt to obtain a warrant early on a Sunday morning.

As a result of the protections that the Fourth Amendment provides against warrantless searches and seizures in the home, "the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests;" "[b]efore agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." Welsh, 466 U.S. at 749-50, 750. When dealing with "mixed questions of law and fact involving constitutional issues," such as whether or not there were exigent circumstances to justify a warrantless entry into a home, we conduct a de novo review in accordance with the dictates of the United States Supreme Court in Ornelas, 517 U.S. at 697-98. See Linde, 876 A.2d at 1124 (internal quotation marks omitted).

For this Court to conclude there was an exigency, the "ultimate test is whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant." United States v. Adams, 621 F.2d 41, 44 (1st Cir. 1980); see also Hegarty v. Somerset County, 53 F.3d 1367, 1374 (1st Cir. 1995). Moreover, we are mindful of the admonition of the United States Supreme Court to the effect that "[w]hen an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant." Welsh, 466 U.S. at 751 (quoting McDonald v. United States, 335 U.S. 451, 459-60 (1948) (Jackson, J. concurring)). Such immediate and serious consequences may be present if any of the following exist: the potential of the destruction of evidence inside a residence before a warrant is obtained; a risk that a suspect may escape; or a threat "posed by a suspect, to the lives or safety of the public, the police officers, or [the suspect]." Hegarty, 53 F.3d at 1374; see also Minnesota v. Olson, 495 U.S. 91, 100 (1990). This Court has stated on numerous occasions that "[w]hether circumstances rise to the level of exigency is determined by referring to the facts known to the police at the time of the arrest. * * * '[T]he police [must] have an objective, reasonable belief that a crisis can only be avoided by swift and immediate action.'" State v. Gonsalves, 553 A.2d 1073, 1075 (R.I. 1989) (quoting Duquette, 471 A.2d at 1363); see State v. Werner, 831 A.2d 183, 196-97 (R.I. 2003); see also Hegarty, 53 F.3d at 1375-76 ("We must isolate all reasonably reliable information collectively known to the officers at the time their challenged conduct occurred, without indulging hindsight * * * to determine whether an objectively reasonable officer, with the identical information, could have concluded that there were exigent circumstances * * *.") (emphasis in original) (internal quotation marks omitted).

We remain "mindful that police are in the emergency service business and they usually have little or no time to leisurely consider their options or engage in protracted evaluation." Portes, 68 A.3d at 1137; see also State v. Morin, 68 A.3d 61, 67-68 (R.I. 2013). Police officers are often confronted with rapidly unfolding and often dangerous situations that must be evaluated in context and not with the eyes of the proverbial Monday morning quarterback. However, in the instant case, the police clearly knew the identity of the person who they believed was the shooter—Mr. Gonzalez—from almost the very beginning of their investigation.[11] Detectives Digregorio and Grant testified that, upon arriving at the police station very early on the morning of January 22, 2012 to assist in the investigation, they were told that "Tony Gonzalez" had committed the crime. Detective Mee specifically testified that he arrived at the Warwick Police Station at approximately sixteen minutes after midnight and was told that Mr. Gonzalez had committed the shooting. It was approximately seven o'clock in the morning when the police proceeded to defendant's apartment to effectuate his arrest. There is no requirement that an arrest warrant include the location of the individual to be arrested. See Rule 4(b) of the Superior Court Rules of Criminal Procedure. Consequently, a warrant could have been obtained, or at least an attempt could have been made to obtain a warrant, at any time in the approximately seven hours between the time when the police had ample reason to believe that defendant had committed the shooting and his eventual arrest. The United States Court of Appeals for the First Circuit has stated that exigent circumstances require that there be a compelling need for immediate action and "no time to secure a warrant." Adams, 621 F.2d at 45.

---

[11]     We note that, although the transcript of the 911 call in the instant case was not admitted at the suppression hearing, it is very clear from that transcript that a member of the Warwick Police Department was on the phone during the call and that Ms. Dalomba identified the shooter as Mr. Gonzalez several times, giving a description and his date of birth. She even went so far as to provide Mr. Gonzalez's home address three times. The address she provided was the same address at which defendant was eventually located and arrested.

When the officers were asked why no attempt was made to obtain a warrant, Det. McHale testified that the police knew that defendant was potentially armed since Ms. Dalomba had told Det. Mee and him that Mr. Gonzalez was known to carry a firearm "everywhere he goes." Detective McHale added that there was a possibility of the destruction of evidence and that defendant could "hurt someone else." He also testified that time was "of the essence." Detective Grant's testimony reflected his concern with respect to the destruction of evidence. He also stated that the police were told by Ms. Dalomba's mother that Mr. Gonzalez carried a firearm; he added that defendant's brother told the police that defendant "typically [slept] with a handgun under his pillow." Moreover, it was Det. Grant's testimony that the severity of the crime concerning which defendant was a suspect influenced his concerns regarding safety, particularly officer safety. In his testimony, Det. Digregorio also referenced the fact that the officers had reason to believe that defendant was armed, that there were concerns about destruction of evidence, and that there was a possibility of harm to the public or to Mr. Gonzalez himself. In accordance with consistent precedent, these various concerns of the officers were legitimate and deserved to be taken into account when determining the existence of exigency vel non and were certainly appropriately considered by the trial justice in reaching his conclusion that exigent circumstances were present in the instant case. See Hegarty, 53 F.3d at 1374. We do not seek to downplay the critical nature of those factors. However, even given the officers' testimony regarding the facts known to them at the time of the arrest, we cannot overlook the fact that there was a period of almost seven hours during which attempts could have been made to obtain a warrant. See Gonsalves, 533 A.2d at 1075.

Detective Digregorio testified that there "wasn't time" to obtain a warrant; it was his testimony that, "[t]o sit down at a desk and type out a warrant at that point in time to me was a

waste of resources, in my opinion." But, in our judgment, attempting to procure a warrant during an approximately seven hour investigation would definitely <u>not</u> have constituted a waste of resources. A court considering a defendant's rights under the Fourth Amendment should not be concerned with efficiency: "[T]he mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment. * * * The investigation of crime would always be simplified if warrants were unnecessary. But the Fourth Amendment reflects the view of those who wrote the Bill of Rights that the privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law." <u>Mincey v. Arizona</u>, 437 U.S. 385, 393 (1978); <u>see</u> <u>Adams</u>, 621 F.2d at 45 (noting that exigent circumstances did not exist in a situation where the evidence suggested that "no thought at all was given to obtaining a warrant because '[t]here would be no reason to'") (quoting one of the federal agents who was involved in the case). Despite the legitimate concerns of the officers involved, there is no evidence that a need for swift and immediate action existed for the entire seven hour period during which the police knew the identity of the person who they clearly believed to be the shooter that would have justified the failure of the police to even attempt to obtain a warrant. <u>See</u> <u>Gonsalves</u>, 553 A.2d at 1075.

By way of comparison, the United States Court of Appeals for the Seventh Circuit held that a warrantless entry into a motel room was constitutional when the suspect may have been alerted that the "police had closed in on him," the police could see through the window that the suspect was sitting on a bed with a sawed-off shotgun next to him, and there were two women and three children in the motel room; the court stated that the situation presented was one where "the police did not have enough time to get a warrant." <u>United States v. Hardy</u>, 52 F.3d 147, 148, 149 (7th Cir. 1995). Additionally, as previously referenced, the United States Court of

Appeals for the First Circuit has stated that exigency requires a "compelling need for official action and no time to secure a warrant." Adams, 621 F.2d at 45. The First Circuit in that case went on to hold that a warrantless entry into Ms. Adams's apartment to arrest an escaped convict did not meet the standard and violated Ms. Adams's Fourth Amendment rights even though the police had reason to believe the escaped convict was in the apartment at the time they entered. Id. at 43-45. The arrest took place approximately two weeks after the convict had escaped from custody, and, at the time the convict escaped it was known that she would likely make her way to Ms. Adams's apartment. Id. Both of these cases are emblematic of judicial concern as to whether or not there was time under the particular circumstances of a given case to obtain a warrant. Our review of the instant case suggests that it more closely parallels the factual situation in Adams since there is scarcely any evidence of the same need for immediate action or lack of time to procure a warrant as existed in Hardy.

The state argues that the instant case involved an ongoing manhunt in the field which could not be interrupted to obtain a warrant. It is true that we have stated that "[a]s a result of an ongoing investigation in the field" when police located a suspect they deemed to be armed and dangerous and in a "highly emotional state" less than one hour after he committed a shooting, warrantless entry into an apartment to effectuate his arrest was not a violation of the Fourth Amendment. Gonsalves, 553 A.2d at 1075, 1076. However, in that case we articulated a distinction between "emergency situations," which require prompt police action where the Court focuses on the "practicability" of obtaining a warrant, and "'planned' arrests," which do not stem from "an ongoing investigation in the field;" and we then held that that case fell into the first category. Id. at 1076 (citing Steagald v. United States, 451 U.S. 204, 222 (1981)). The instant case did not involve an emergency situation. In Gonsalves, the arrest took place less than an

hour after the shooting, and the suspect was known to be in a highly emotional state. In the instant case, by contrast, approximately seven hours had elapsed after the shooting before the arrest was effectuated. The current situation is much more comparable to a planned arrest. After determining defendant's location, some of the Providence and Warwick police officers involved met in Providence, waited for the remaining Warwick detectives to arrive, and then proceeded to defendant's residence in a "caravan." The police subsequently set up a perimeter around the apartment in which defendant resided. In addition to it clearly having been possible for the police to at least have attempted to procure an arrest warrant during the seven hours in which the police knew for whom they were searching, when the police actually located defendant and surrounded his home, they could at that point have simply maintained a perimeter and waited for him to step outside or for a warrant to be procured. We would also note that the testimony reflects the fact that there were many officers from both Warwick and Providence involved in this investigation and arrest, negating any argument that there were no means by which an attempt could have been made to obtain an arrest warrant simultaneously with the attempts to locate the suspect. At any time after defendant became the sole suspect, which was very shortly after the shooting, a single officer could have been dispatched to seek a warrant while the other officers continued their quest for Mr. Gonzalez. Consequently, it is clear to this Court that seeking to obtain a warrant was practicable in this case. Our review of the record and the parties' arguments indicates that there was no compelling necessity for immediate action which existed for the entirety of the approximately seven hours leading up to the arrest; in other words, there was time for the police to have attempted to obtain a warrant for defendant's arrest. See Adams, 621 F.2d at 44.

For these reasons, it is our judgment that the state has not met its "heavy burden" of overcoming the presumptive unreasonableness of a warrantless entry into a home by establishing the existence of exigent circumstances to justify such an entry. See Welsh, 466 U.S. at 749-50. We have also determined that there was no consent to the entry of the police into the apartment where Mr. Gonzalez resided. Accordingly, we conclude that the entry into Mr. Gonzalez's residence, without a warrant, violated his Fourth Amendment rights. See Payton, 445 U.S. at 590. The resulting arrest within his home was also "necessarily unlawful." Bailey, 417 A.2d at 919. Consequently, under the exclusionary rule, "the fruits of such an arrest (evidence seized in the dwelling) should have been suppressed." Werner, 831 A.2d at 195; see also State v. Jennings, 461 A.2d 361, 368 (R.I. 1983) ("The exclusionary rule bars from introduction at trial evidence obtained either during or as a direct result of searches and seizures in violation of an individual's Fourth Amendment rights."). Accordingly, we hold that the trial justice erred in failing to exclude the following evidence obtained during or subsequent to defendant's illegal arrest: his statement that the gun the police were asking him about was not in the apartment, as well as the following items defendant points to, "a black Taurus handgun case, a 9 mm magazine, receipt for a gun purchase from D&L gun store, a black bubble vest, [gray] Timberland boots, a black jacket, and a multi-colored scarf" (collectively, the tainted evidence).

However, our inquiry does not end there; we must also address the fact that defendant, after his arrest, signed a form consenting to the search of his bedroom. When determining whether the tainted evidence should have been admissible "we must ask whether 'granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" Bailey, 417 A.2d at 919 (quoting Wong Sun v. United States, 371

U.S. 471, 488 (1963)). The consent of a defendant may be valid if it is "sufficiently attenuated from the illegal police action to dissipate the taint." State v. Casas, 900 A.2d 1120, 1134 (R.I. 2006) (internal quotation marks omitted). Some of the factors which this Court takes into account when assessing whether the taint has dissipated include the "[t]emporal proximity of the arrest and the [consent to search], the presence of intervening circumstances, * * * and, particularly, the purpose and flagrancy of the official misconduct * * *." Id. at 1134-35 (internal quotation marks omitted). However, the burden of proving that the primary taint has been purged falls on the state. State v. Parra, 941 A.2d 799, 805 (R.I. 2007). Moreover, particularly pertinent to this case is our statement that "consent [that] is obtained during the course of an illegal detention" is "presumptively * * * invalid." Id. at 804; see also Casas, 900 A.2d at 1134.

In the instant case, Det. McHale testified that, after defendant was arrested and during the ride from the apartment to the police station, the police cruiser that was transporting defendant pulled over and the consent form was read to him. His handcuffs were then removed, and he was allowed to read the form himself. If we begin, as we must, with the presumption that defendant's consent was invalid, our review of the evidence elicited at the motion to suppress hearing does not reveal the existence of sufficient evidence presented by the state to overcome that presumption. See Parra, 941 A.2d at 804. There was only a short period of time between defendant's arrest, which occurred immediately upon the entry by the police into the apartment, and his signing of the consent to search form on the way to the police station. See Casas, 900 A.2d at 1134-35; see, e.g., United States v. Torres, 274 F. Supp. 2d 146, 158 (D.R.I. 2003) (holding that a consent to search was not sufficiently attenuated from an illegal arrest when the defendant was handcuffed immediately following the unlawful entry into his home and only approximately thirty minutes had elapsed between the arrest and the consent). In the case before

us, defendant's handcuffs were removed before he signed the consent to search form; but he was still sitting in the back of the police cruiser, with two police officers in the vicinity of the cruiser, immediately after having experienced the illegal entry into his residence by several police officers, who immediately proceeded to arrest him on that Sunday morning. We have been unable to discern in the record any intervening circumstances that would lead to the determination that defendant's consent was sufficiently attenuated from his illegal arrest so as to be untainted by the preceding illegal police activity. See Casas, 900 A.2d at 1134-35. Accordingly, we conclude that the trial justice clearly erred in finding defendant's consent to be voluntary. See Patino, 93 A.3d at 50.

As such, it is our holding that there was insufficient evidence to show: (1) that Ms. Gonzalez consented to the entry of police into her home; (2) that Ms. Gonzalez's signing of the consent to search form was free and voluntary;[12] (3) that sufficiently exigent circumstances were present so as to justify the warrantless arrest; and (4) that defendant's signing of the consent to search form was sufficiently attenuated from his illegal arrest so as to be a valid consent. Accordingly, we conclude that the tainted evidence was obtained in violation of defendant's Fourth Amendment rights and the trial justice erred in allowing it to be admitted into evidence at defendant's trial.

### c. Harmless Error

Our analysis does not cease with our conclusion that the evidence obtained as a result of the unlawful entry into defendant's home should not have been admitted at trial. The state

---

[12]    In Part II.A.2.a.ii, supra, we concluded that Ms. Gonzalez's written consent to search the apartment was not free and voluntary. We deem it worth noting that it could also be argued that her written consent was not sufficiently attenuated from the illegal entry into her home and the unlawful arrest of her son to hold that any taint had been dissipated sufficiently to make her consent valid. See State v. Casas, 900 A.2d 1120, 1134 (R.I. 2006).

contends that, even if the consent and exigent circumstances exceptions to the warrant requirement do not apply, any error resulting from the admission of evidence obtained as a result of the unlawful entry into defendant's home was harmless due to the "truly overwhelming" evidence of defendant's guilt.

It is important to begin our analysis of the applicability of the harmless error principle by noting that, while it does not apply to all constitutional errors, the United States Supreme Court has applied the harmless error principle to the admission of evidence obtained in violation of a defendant's Fourth Amendment rights. Chambers v. Maroney, 399 U.S. 42, 53 (1970). Moreover, this Court has acknowledged and followed that precedent. See, e.g., State v. Danahey, 108 R.I. 291, 296, 274 A.2d 736, 739 (1971). Thus, the issue before us is whether or not the admission of the tainted evidence in the instant case was harmless.

The harmless error principle specifically requires "the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Chapman v. California, 386 U.S. 18, 24 (1967) (emphasis added). The same harmless error principle—requiring the "government to prove beyond a reasonable doubt that the error did not influence the verdict"—has been utilized by the United States Court of Appeals for the First Circuit. United States v. Sasso, 695 F.3d 25, 29 (1st Cir. 2012); see United States v. Gray, 780 F.3d 458, 469 (1st Cir. 2015). Additionally, the same standard has been utilized by this Court; in fact, we have directly quoted the just-referenced language from Chapman on numerous occasions. See, e.g., State v. Watkins, 92 A.3d 172, 189 n.9 (R.I. 2014); State v. Mercurio, 89 A.3d 813, 822 (R.I. 2014); State v. Golembewski, 808 A.2d 622, 624 (R.I. 2002); State v. Smith, 446 A.2d 1035, 1036 (R.I. 1982); State v. Sherman, 113 R.I. 77, 83, 317 A.2d 445, 449 (1974). Furthermore, we have held that, when determining if an error is harmless, we

look at "various factors, including the relative degree of importance of the witness testimony to the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and * * * the overall strength of the prosecution's case." State v. Bustamonte, 756 A.2d 758, 766 (R.I. 2000) (internal quotation marks omitted). In some situations where there is an "overwhelming amount" of evidence indicative of a defendant's guilt, this Court has declined to apply the harmless error principle. See State v. Perez, 882 A.2d 574, 590 (R.I. 2005); see also Harrington v. California, 395 U.S. 250, 254 (1969); State v. Ciresi, 45 A.3d 1201, 1215 (R.I. 2012); State v. Humphrey, 715 A.2d 1265, 1276 (R.I. 1998).

We acknowledge that there was substantial evidence of defendant's guilt in this case, even when one does not take into account his statement about the gun which he made during his arrest and the tainted physical evidence recovered from his apartment. Ms. Dalomba testified that she saw Mr. Gonzalez shoot Mr. Cunningham. All of the text messages exchanged between Mr. Gonzalez, Ms. Dalomba, and Mr. Chivers leading up to the shooting were admitted into evidence; the content of some of those messages was very damaging to defendant's case. Moreover, Mr. Noth testified to having dropped defendant off near the time of the shooting at a house whose description matched that of Ms. Dalomba's house. Additionally, there was Mr. Hutchins's testimony about the exchange he had with Mr. Gonzalez in a "holding tank" at the ACI. However, despite the ample evidence against defendant—prescinding from the tainted evidence from the unlawful entry into his home—we simply cannot say that the evidence is so overwhelming that the state has met its burden of proving beyond a reasonable doubt that the tainted evidence did not influence the verdict. Contra Clark v. Ellerthorpe, 552 A.2d 1186, 1188

- 40 -

(R.I. 1989) (holding that where "the undisputed facts establish that [the] petitioner entered [the victim's] cell and brutally stabbed him to death" the evidence of guilt was "overwhelming").

Ms. Dalomba was the only eyewitness to the shooting of Mr. Cunningham. As such, her credibility was of the utmost importance. In the state's closing argument to the jury, the prosecutor stated that she did not disagree that Ms. Dalomba was a "horrible person." She added:

> "I told you all that at the beginning; you weren't going to like her, she's going to be rude, obnoxious, defiant and disrespectful. And she's all of those things. She certainly delivered. But one thing she didn't do was lie to you. * * * [T]he accounts of what happened, that she gave on th[e] stand [are] corroborated by the physical evidence that was obtained in this particular case."

Likewise, defense counsel specifically told the jury during his opening statement that it could be argued that the case would "rise and fall on the testimony of Patricia Dalomba." Defense counsel went on to state the following:

> "She's the least credible person in this room right now. I'm going to say it again. If her mouth is moving, she's lying. She has no way of dealing with people other than that. Her life is a game. It's a soap opera. People in her life mean nothing to her. They're just these pawns in her game where everything is about her. The most self-centered person you're ever going to meet."

Thus, it is abundantly clear that neither side considered Ms. Dalomba to be a particularly palatable witness.

Consequently, we find it determinative that the evidence from defendant's apartment—most particularly, the clothes he was wearing the night of the shooting—not only served to point toward his guilt but also directly corroborated Ms. Dalomba's testimony. See Bustamonte, 756 A.2d at 766 (listing evidence that corroborates witness testimony as constituting one of the facts to be considered in determining harmless error). Ms. Dalomba testified at trial regarding what defendant was wearing at the time of the shooting and she identified the clothes seized from

defendant's apartment at the police station as the same clothing he had been wearing, which fact was also testified to at trial. Moreover, the prosecutor referenced defendant's clothing multiple times during both her opening statement and her closing argument, even specifically pointing out to the jury that the physical evidence corroborated Ms. Dalomba's testimony. In our judgment, the fact that the testimony of Ms. Dalomba, the only eyewitness, was made more credible by the tainted physical evidence seized from defendant's apartment makes it quite possible that it could have had an impact on a juror's decision with respect to Ms. Dalomba's credibility; a decision of vital significance in this case.[13] See Mercurio, 89 A.3d at 822-23 (holding that error was not harmless where it affected witness credibility and credibility was "central to the case"); Smith, 446 A.2d at 1036 (stating that the "crucial issue" was one of credibility and further stating that the improper line of questioning "bore directly on the credibility"— resulting in a holding that the error was not harmless).

Additionally, the gun-related evidence found in defendant's bedroom, which included a receipt for the purchase of a gun that the police were unable to locate, may have weighed on a juror's decision about whether defendant had the means to access a firearm to commit the crime for which he was charged. Moreover, the gun-related evidence was also mentioned by the prosecutor in her closing argument. Thus, in the instant case, the tainted evidence had the definite potential of being quite damaging to defendant's case; for that reason, we are unable to say that it was harmless beyond a reasonable doubt. See Bumper, 391 U.S. at 550 (holding that the admission of a rifle which was "plainly damaging evidence against the petitioner" was not harmless error).

---

[13] It is worth noting that the tainted physical evidence also corroborated Michael Noth's testimony that defendant was wearing a "black bubble vest" on the night of the shooting.

No court can scrutinize the minds of jurors so as to be able to know with certainty what did or did not influence a particular verdict. But the Supreme Court has told us that the state must "prove, <u>beyond</u> <u>a</u> <u>reasonable</u> <u>doubt</u>, that the error complained of [(the tainted evidence in this case)] did not contribute to the verdict obtained." <u>Chapman</u>, 386 U.S. at 24 (emphasis added). After our exhaustive review of the record in this case, we <u>are</u> left with reasonable doubt as to whether or not the tainted evidence, at the very least, influenced the jury's credibility determinations, and, at most, directly affected the jury's determination of defendant's guilt. As such, it is our opinion that the error in this case was not harmless.

**B**

**Juror Bias**

Given our holding with respect to the introduction of the evidence obtained as a result of the unconstitutional arrest and the subsequent search of the defendant's home, we need not address the defendant's further contention on appeal that two of the jurors in his case were biased and should have been dismissed or, in the alternative, his motion for a mistrial should have been granted. <u>See</u> <u>Grady v. Narragansett Electric Co.</u>, 962 A.2d 34, 42 n.4 (R.I. 2009) (referencing "our usual policy of not opining with respect to issues about which we need not opine").

**III**

**Conclusion**

For the reasons set forth in this opinion, we vacate the judgment of the Superior Court and remand the case to that tribunal for a new trial.


**Justice Goldberg, concurring.** I concur in the judgment of the majority but nonetheless write separately. Of paramount importance in this case is the question of whether the warrantless

arrest of the defendant, Tony Gonzalez, in his home and the subsequent search of his bedroom violated the Fourth Amendment to the United States Constitution.  As the Supreme Court of the United States has repeatedly and unswervingly declared, any inquiry into the reasonableness of searches and seizures demands a highly fact-driven analysis.  See, e.g., Missouri v. McNeeley, 133 S. Ct. 1552, 1559 (2013); Ohio v. Robinette, 519 U.S. 33, 39 (1996); Minnesota v. Olson, 495 U.S. 91, 100 (1990).  Accordingly, I recount in detail the salient facts presented at the pretrial suppression hearing in the Superior Court.

The Warwick Police Department was alerted to the shooting at approximately five minutes past midnight on January 22, 2012.  By 1 a.m., the police knew the name of the suspect—Tony Gonzalez, defendant in this case.  At that time, the police captain gave officers assigned to the case a briefing—lasting about thirty minutes—concerning the details uncovered thus far.  The police sergeant then departed for the crime scene while at least four detectives remained at the station to conduct witness interviews.

Detectives Joseph Mee (Det. Mee) and John McHale (Det. McHale) interviewed Patricia Dalomba (Dalomba), defendant's ex-girlfriend, who had witnessed the shooting.  From Dalomba they learned that defendant had fled the scene in a vehicle carrying multiple passengers, which she believed to be owned by defendant's brother, Juan Zachary Garcia (Garcia).  Dalomba also told the detectives that, in her experience, defendant carried a handgun at all times.  The interview lasted between one-and-a-half and two hours.  In a separate interview room, Dets. Thomas DiGregorio (Det. DiGregorio) and Timothy Grant (Det. Grant) interviewed Matthew Chivers, Dalomba's new paramour, who also had been present at the shooting.

At approximately 3 a.m. or 3:30 a.m., a group of officers met to discuss the witnesses' statements and "tried to * * * piece together some information" in order to locate defendant.

- 44 -

They searched for addresses in the computer system and made multiple telephone calls to defendant's wireless service provider to determine the location of his mobile telephone. Sometime after 4 a.m., Dets. Grant and DiGregorio left for Providence to pursue a lead based on a telephone call placed from defendant's telephone to another telephone traced to the Silver Lake neighborhood.

The record discloses that the officers learned that four months earlier, in September 2011, defendant had been involved in another altercation with one of Dalomba's boyfriends and that defendant had surrendered voluntarily to the police. Warwick police dispatchers contacted defendant, who indicated that he intended to turn himself in.

At approximately 5:15 a.m., Dets. Mee and McHale visited the crime scene; they stayed for ten minutes and then returned to the police station. Meanwhile, multiple Warwick officers, accompanied by officers from the West Warwick Police Department and the Rhode Island State Police, visited Garcia at his home. At approximately 6:15 a.m.—six hours after the murder—the officers arranged for Garcia to make a "controlled" telephone call to his brother. During the call, Garcia informed defendant that the police had been at Garcia's home and were searching for defendant. The defendant told Garcia that he had been asleep, in bed at the home he shared with his mother in the Chad Brown public housing complex in Providence. Before the police departed, Garcia advised them that defendant often sleeps with a handgun under his pillow.

Shortly before 7 a.m., with a credible lead on defendant's location, six Warwick officers reported to a Providence Police Department substation, where they assembled with at least six members of the Providence Police Department for approximately twenty minutes. Detectives DiGregorio and Grant briefed their Providence brethren. An assemblage of uniformed and plainclothes officers from both departments then departed in a "caravan" for defendant's

residence. They traveled in "three marked units and a couple of detective units from Warwick." At no time had police from either department obtained an arrest warrant or a search warrant, nor had anyone attempted to do so.

Upon arriving at the Chad Brown public housing complex, just after 7 a.m. on a Sunday morning, a phalanx of police officers surrounded the building and established a perimeter around the residence in order to prevent defendant from fleeing. Patrolman Joseph Dosreis (Ptlm. Dosreis) of the Providence Police Department knocked on the front door of defendant's residence. He carried a tactical shield described as "a protective police shield similar to a riot shield, approximately four [feet] in length and maybe two feet wide." With him stood two fellow Providence officers; all wore bulletproof vests, with protection helmets that masked their faces. Patrolman Dosreis's gun was holstered, whereas the other officers' guns were "displayed."

The defendant's mother, Cira Gonzalez (Cira), was awakened by the knock on the door.[14] She descended the staircase from her second-floor bedroom, still wearing her pajamas. When Cira opened the front door, Ptlm. Dosreis yelled, "Where's Tony? Where's Tony?" at least once or twice. She did not respond verbally. Rather, Ptlm. Dosreis described the encounter as follows:

> "We had eye contact. I asked for Tony, where is he, where is he. And I was under the impression that he would be up in the bedroom so I looked and she looked up toward the stairs and looked like that. (Indicating)."

From Ptlm. Dosreis's experience as a patrolman, he knew that all bedrooms in the Chad Brown complex were located on the second floor, and he recalled that Garcia had indicated that

---

[14] To distinguish her from defendant, I refer to Cira Gonzalez by her first name. I intend no disrespect.

defendant had been in his bedroom at the time of the controlled call. It is undisputed that Cira did not give oral consent to enter her home; at best, she glanced toward the staircase in response to the officer's inquiry and made a gesture of some sort. It also is uncontested that Ptlm. Dosreis never asked for permission to enter the home, and, according to Cira, the officers simply pushed their way into the home. At least three officers bounded up the stairs to apprehend defendant.

The sequence of events was disputed by the parties. According to Ptlm. Dosreis, he first looked into the living room to his left and saw a man by the couch who, he determined, was too tall to fit the description of the five-foot-five-inch or five-foot-six-inch suspect. Patrolman Dosreis testified that his gaze returned to the top of the staircase, where he saw a man who fit the description. He then ran up the stairs, followed by other officers. According to Det. Grant, ten to fifteen seconds elapsed from the time that Cira opened the door to the entry into the residence. On the other hand, Cira testified that, by the time she glanced up, the officers already were climbing the staircase. According to Cira, three officers "walked in and * * * [she] had no other choice but to walk back because they were walking in."

Upstairs, Ptlm. Dosreis and another uniformed Providence officer encountered defendant, wearing only his boxer shorts and a T-shirt, turning his back as if he were attempting to return to his bedroom. Announcing that he was with the "Providence Police," Ptlm. Dosreis pushed defendant to the floor, face-down, in the area between defendant's bedroom and the hallway. As he handcuffed defendant with the assistance of another officer, Ptlm. Dosreis asked about defendant's firearm and where it was located. The defendant responded, "It's not here." According to Det. Grant—who had reached the top of the staircase while defendant was being handcuffed—an open handgun case rested in plain view on a table in defendant's bedroom. Inside was a loaded magazine and some paperwork, but no handgun.

- 47 -

After the arrest, at approximately 7:40 a.m., the police escorted defendant downstairs to the living room and sat him on the couch. The record discloses that there were numerous members of law enforcement in the home at this time. The scene was described by one officer as "chaotic"; before defendant was taken into custody, there was "yelling and screaming," and officers used profanity. Cira was described by the witnesses as being "in shock"—she was "crying," "nervous[,] and scared." Detective DiGregorio advised defendant of his Miranda rights, and then he and Det. Mee asked defendant about his whereabouts the previous night and the location of the handgun. The defendant repeated that the handgun was not there. Patrolman Dosreis testified that he remained at the home for about ten minutes, at which point the investigation was turned over to Warwick Police. Importantly, Ptlm. Dosreis testified that he not only saw the handgun case in defendant's second-floor bedroom, "I saw the gun case being taken out of there."

After defendant was situated on the couch in the living room, Cira went upstairs to find warm clothes for defendant; she was accompanied by an officer. When she returned with a pair of gray boots—the same color boots that Dalomba had reported that defendant had worn at the time of the shooting—Det. Mee instructed her to retrieve another pair of shoes, which she did. Warwick officers then escorted defendant out of the house and into the back of a marked police cruiser.

As Det. McHale and another officer transported defendant to the Warwick police station, having driven less than one-half mile, they detoured into a nearby parking lot in order for defendant to execute a form consenting to a search of his bedroom. According to Det. McHale, he received a call from the sergeant directing him to inquire if defendant would consent to a search of his bedroom. According to Det. McHale, defendant agreed, and the officers stopped

the vehicle; both officers exited the car and opened the rear doors of the cruiser. The other officer read the standard form aloud to defendant, filled out the form, and presented it to defendant, whose handcuffs were removed for ease of reading and signing. This event occurred at 8:06 a.m., within moments of his departure from the home.

Meanwhile, at 8:10 a.m., Cira also executed a consent-to-search form at the request of the police. Detectives Grant and Mee then searched defendant's bedroom, where they seized a vest, a jacket, a scarf, and a mobile telephone. The handgun case with the loaded magazine, a receipt for a 9-millimeter Taurus handgun, and the gray boots retrieved by Cira also were seized, although exactly when this occurred was not established. It is undisputed that all items were seized from defendant's bedroom.

### The Warrantless Arrest in the Home

When this Court undertakes review of the constitutionality of a warrantless arrest in the home and the subsequent search and seizure of items from the accused's bedroom, we do not venture into new constitutional territory. Our task is to look to the holdings of the United States Supreme Court, particularly its longstanding recognition that "[a]t the very core [of the Fourth Amendment] stands 'the right of a man to retreat into his own home and there be free from unreasonable government intrusion.'" Payton v. New York, 445 U.S. 573, 589-90 (1980) (quoting Silverman v. United States, 365 U.S. 505, 511 (1961)). The specter of police officers "thrust[ing] themselves into a home is * * * a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance." Johnson v. United States, 333 U.S. 10, 14 (1948). To protect the public against "zealous" "officer[s] engaged in the often competitive enterprise of ferreting out crime," the Fourth Amendment requires that a "neutral and detached magistrate" review the evidence against a suspect and make

a "disinterested" determination whether to issue a warrant. Id. at 13, 14. Any evidence seized as a result of a nonconsensual warrantless entry into the home will not withstand constitutional scrutiny unless a recognized exception to the warrant requirement applies. See Payton, 445 U.S. at 583, 590.

The state argues that the warrantless entry into defendant's home was supported by both consent and exigent circumstances. A review of the facts in this case demonstrate that there is no set of conceivable circumstances in which Cira provided the officers with consent to enter the apartment. The question of whether there was valid consent is reviewed by this Court de novo. State v. Linde, 876 A.2d 1115, 1124 (R.I. 2005). Awakened by a loud bang on her front door at approximately seven o'clock in the morning, Cira discovered numerous police officers—arrayed in riot gear with masks and shields and weapons drawn—surrounding her home at the Chad Brown public housing complex. Upon opening the door, she found herself face-to-face with a masked officer, equipped with a four-foot-long shield, who demanded to know the whereabouts of her son. Behind him, more officers stood with their guns drawn. When Ptlm. Dosreis demanded to know where her son was, a speechless Cira glanced or gestured toward the stairs, and several officers ran up the stairs and apprehended defendant, who was standing there in his underwear.

The trial justice concluded that this interaction constituted a consensual entry into the home. He found that the officers entered the apartment "quickly" because they were looking for a person suspected of murder with a firearm within hours of its commission. Thus, he concluded, the police were "not going to waste time spending a lot of time explaining, you know, the background [of why they were there]. 'Where's Tony?' 'We're looking for Tony.' He's upstairs, and they went upstairs." Even the most generous reading of this finding does not

constitute consent. "The Fourth Amendment prohibition against the warrantless entry into a person's home does not apply 'to situations in which voluntary consent has been obtained * * *.'" State v. Barkmeyer, 949 A.2d 984, 996 (R.I. 2008) (quoting Illinois v. Rodriguez, 497 U.S. 177, 181 (1990)). The state bears the burden of proving, "by a fair preponderance of the evidence," that the lawful occupant of the home voluntarily consented to the police entering his or her home. Id. at 997 (quoting State v. O'Dell, 576 A.2d 425, 427 (R.I. 1990)). "[T]he state must prove that the consent was 'freely and voluntarily given.'" State v. Bailey, 417 A.2d 915, 918 (R.I. 1980) (quoting Bumper v. North Carolina, 391 U.S. 543, 548 (1968) and citing Palmigiano v. Mullen, 119 R.I. 363, 370, 377 A.2d 242, 246 (1977)). This Court has recognized that the state's burden of proof to establish valid consent "cannot be discharged by showing no more than acquiescence to a claim of lawful authority." State v. Beaumier, 480 A.2d 1367, 1374 (R.I. 1984), overruled on other grounds, State v. Rios, 702 A.2d 889, 889-90 (R.I. 1997) (quoting Bumper, 391 U.S. at 548-49). In Beaumier, this Court recognized that "various barometers" have been established "to determine whether the consent was truly voluntary," including "the number of police officers entering the home, * * * the apprehension of a family member, * * * the time of day, * * * and an outlandish display of weaponry." Id. Many of those factors are present in this case. First, Cira was not the reason the police awakened her family that morning. She was confronted with numerous armed officers, in riot gear, with masks and shields; no one asked permission to enter, yet several officers rushed up the stairs to apprehend her son, who also may have been sleeping. An allegation that an occupant who is not the person sought by police voluntarily consented in the face of a number of armed officers demands scrutiny. See Lowery v. State, 499 S.W.2d 160, 168 (Tex. Crim. App. 1973). "The display of weapons is a coercive factor that sharply reduces the likelihood of freely given consent." Id. The evidence in this case

does not substantiate the burden of proving that the entry into the home in order to arrest defendant was consensual. Accordingly, I am satisfied that in finding a consensual entry; the trial justice clearly erred.

The state's next argument, that the exigency of the situation justified the warrantless entry, is equally flawed. The exigent-circumstances exception to the warrant requirement applies when "there is compelling need for official action and no time to secure a warrant." McNeeley, 133 S. Ct. at 1559 (quoting Michigan v. Tyler, 436 U.S. 499, 509 (1978)). Examples of circumstances recognized as exigent include "law enforcement's need to provide emergency assistance to an occupant of a home, * * * engage in 'hot pursuit' of a fleeing suspect, * * * enter a burning building to put out a fire and investigate its cause, * * * [and] prevent the imminent destruction of evidence." Id. at 1558-59; see also State v. Jennings, 461 A.2d 361, 366 (R.I. 1983).

"Any warrantless entry based on exigent circumstances must * * * be supported by a genuine exigency." Kentucky v. King, 563 U.S. 452, 470 (2011) (emphasis added). Mere inconvenience to the police does not provide a reasonable basis for forgoing a warrant, Johnson, 333 U.S. at 15, nor does the desire to lead a more "efficient" investigation, Mincey v. Arizona, 437 U.S. 385, 393 (1978) ("[T]he privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law."). Significantly, the gravity of the offense alone fails to create a genuine exigency. Mincey, 437 U.S. at 394.

Here, the police knew the name of the suspect within the first hour of the investigation, yet more than six hours had elapsed without any effort to obtain an arrest warrant. At the suppression hearing, Det. DiGregorio explained that no warrant was sought because, with an

armed murder suspect at large, "time was of the essence" and "[t]o sit down at a desk and type out a warrant at that point in time * * * was a waste of resources." Detective DiGregorio also indicated that there was concern that defendant might attempt to destroy evidence, although this fear appeared to be rooted in generalized conjecture rather than specific facts gleaned during the investigation. Extended to its logical conclusion, such reasoning would negate the need for warrants in any murder investigation in which an armed suspect has not been apprehended. Allowing the police to enter the home of every murder suspect without first obtaining the approval of a disinterested judicial officer, in effect, "would reduce the [Fourth] Amendment to a nullity and leave the people's homes secure only in the discretion of police officers." Johnson, 333 U.S. at 14. It is for the judicial officer to determine that probable cause exists for an arrest, not the police who already are entrenched in the investigation and have developed the understandably single-minded focus of bringing their presumed suspect into custody. See id. These factors are further highlighted by the fact that on a previous occasion when the police were seeking to arrest defendant—certainly not for a brutal homicide—and defendant, upon receiving a telephone call from police dispatch, notified the police of his intended surrender. Although the Warwick detectives were aware of this prior incident, no effort was made to attempt such surrender in this case.

Even the most generous reading of the candid and, indeed, credible testimony of the police officers in this case, reveals that there is no evidentiary support for the hypothesis that defendant intended to harm himself or take more victims. The only evidence as to defendant's whereabouts was the telephone call made by his brother that revealed he was at home in bed. Additionally, over seven hours elapsed from the time of the homicide until defendant was apprehended. No effort was made to secure a warrant for his arrest, yet there were at least four

law enforcement agencies involved in this case with sufficient time to assemble a convoy of heavily-armed officers to surround the home.

The facts of this case are in stark contrast with this Court's holding in State v. Gonsalves, 553 A.2d 1073 (R.I. 1989), in which we affirmed a decision denying the defendant's motion to suppress evidence seized after a warrantless arrest of the defendant in the home of his girlfriend. Id. at 1074, 1076. Less than an hour after he murdered his brother, following "a bitter argument" in a barroom, members of the East Providence Police Department responded to the home of the defendant's parents, where they learned the defendant might be at his girlfriend's apartment in Pawtucket. Id. at 1074. The defendant's father accompanied the police to the residence. Id. They knocked on the wrong door. Id. A woman emerged from the adjacent unit and was ordered back inside by the officers. Id. They knocked again, and she exited once more, at which point the police asked her if she was the defendant's girlfriend, and "she responded affirmatively." Id. When the officers approached her apartment, they observed the defendant sitting on a couch in the living room. Id. After the defendant failed to respond to their repeated entreaties, the officers entered the apartment and arrested the defendant. Id. He struggled with the officers and was less than cooperative. Id. at 1074-75. Bullets from a .38-caliber weapon were seized and introduced into evidence as were the incriminating remarks the defendant made while resisting arrest. Id.

This Court affirmed the decision denying the motion to suppress the evidence in Gonsalves on the ground that an exigent circumstance justifying a warrantless entry and search for evidence may arise when "police believe a person within [the residence] requires immediate assistance or other victims or intruders may still be present." Gonsalves, 553 A.2d at 1075, 1076 (quoting Jennings, 461 A.2d at 366). We concluded that "[t]he need to protect or preserve life or

avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." Id. at 1075 (quoting Jennings, 461 A.2d at 366).

The determination of exigency or emergency turns on "the facts known to the police at the time of the arrest." Gonsalves, 553 A.2d at 1075 (citing United States v. Williams, 612 F.2d 735, 739 (3d Cir. 1979)). The police must "have an objective, reasonable belief that a crisis can only be avoided by swift and immediate action." Duquette v. Godbout, 471 A.2d 1359, 1363 (R.I. 1984). None of these considerations is present in this case, particularly where more than seven hours elapsed from the time of the murder to the warrantless arrest. The subjective, generalized statements of the police—about their concern for destruction of evidence and the possibility that defendant could harm himself or others or escape arrest—are neither sufficient nor fact-based. "The proper line of inquiry is whether the police reasonably believed, relying upon facts known by them at the time of arrest, that the warrantless intrusion was necessary to preserve life or avoid serious injury." Gonsalves, 553 A.2d at 1075-76. I deem this multi-department police action to be more akin to a planned arrest than an emergent pursuit in the field.

In an attempt to persuade us that a police-emergency situation justified the arrest in this case, the state points to previous decisions of this Court. These cases are distinguishable. State v. Portes, 840 A.2d 1131, 1134-35 (R.I. 2004), dealt with evidence seized pursuant to a search warrant after the police were called to an apartment in response to an emergency 9-1-1 call that was hampered by a language barrier. Although no one answered the knock on the door, the police heard running footsteps and a door banging inside. Id. at 1134. A neighbor informed them that the home's occupant had fled in a taxi with her child. Id. Upon entry, the police observed a firearm on the nightstand and a bag of cocaine on the kitchen counter. Id. at 1134-35. They obtained a search warrant and seized a significant quantity of cocaine under the mattress.

Id. at 1135. This Court concluded the police were justified in entering the premises and that, based on the totality of the circumstances, "it would have been unreasonable for the officers to simply walk away from the unanswered door given the 9-1-1 call and other facts known to them." Id. at 1136, 1137.

Likewise, in State v. Shelton, 990 A.2d 191, 193, 194, 195 (R.I. 2010), within moments of a double shooting and homicide, the police discovered the name and address of the perpetrator, and, in less than an hour, they were at the home of Brenda Alvarez, with whom the defendant had "an on-and-off romantic relationship." They found the door to the building unlocked and the door to the apartment "slightly open." Id. at 195. They discovered three teenagers and a baby asleep inside, as well as masks, ammunition, and an unlocked safe in one bedroom. Id. They left the apartment at the request of Ms. Alvarez and waited outside until she arrived home—sometime later—and obtained her written consent to search. Id. This Court concluded that there were exigent circumstances that justified the initial warrantless entry into the home for a security sweep and that the subsequent search was conducted pursuant to a valid consent. Id. at 200. We noted, however, that the extent of the initial entry that was permissible under the circumstances was dictated by the exigency; "[w]hen the security check has been completed, the area is secured, and there is no longer any danger of the loss or destruction of evidence, the search must cease." Id. (quoting Jennings, 461 A.2d at 367).

Finally, although State v. Morin, 68 A.3d 61, 64 (R.I. 2013), involved a warrantless arrest in the defendant's home, it was hardly the result of a planned police foray. Rather, an investigator from the Department of Children, Youth, and Families, lawfully on the premises, called the police after the defendant admitted to molesting his stepdaughter. Id. This Court concluded that the statement he gave to police—after receiving the appropriate Miranda

- 56 -

warnings, id.—was admissible because the arrest was lawful, based on probable cause and exigent circumstances, that included an enraged wife who was the mother of the child, such that it was reasonable for the officer to believe that his assistance was required at the home, id. at 67.

**Consent to Search**

Having concluded that there were no exigent circumstances justifying the warrantless arrest in this case, the exclusionary rule dictates that the evidence be suppressed. However, it also is necessary to determine whether the search was conducted pursuant to a valid consent executed by defendant or his mother. I conclude that there was no valid consent to search in the circumstances of this case. "The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and '[v]oluntariness is a question of fact to be determined from all the circumstances.'" Robinette, 519 U.S. at 40 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973)).

Where the validity of a search hinges upon consent, the state must prove by a preponderance of the evidence that the consent indeed was "freely and voluntarily given." State v. Casas, 900 A.2d 1120, 1134 (R.I. 2006) (quoting O'Dell, 576 A.2d at 427). "Consent given during an illegal detention is presumptively invalid." Id. (quoting United States v. Cellitti, 387 F.3d 618, 622 (7th Cir. 2004)). Consent may be deemed valid only if it is "sufficiently attenuated from the illegal police action 'to dissipate the taint.'" Id. (quoting Wong Sun v. United States, 371 U.S. 471, 487 (1963)). Under these circumstances, it is incumbent upon the state to "demonstrat[e] that the causal connection between the [consent to search] and the illegal arrest was broken so as to dispel the primary taint of the illegal seizure." Id. (quoting State v. Burns, 431 A.2d 1199, 1205 (R.I. 1981)). Courts first must consider how much time elapsed from the illegal arrest to the time of consent, whether there were any actual, valid intervening

circumstances separating the arrest from the consent and then must take a hard look at the "purpose and flagrancy of the official misconduct." Id. at 1135 (quoting Brown v. Illinois, 422 U.S. 590, 604 (1975)). "When there is a close causal connection between the illegal seizure and the [consent], not only is exclusion of the evidence more likely to deter similar police misconduct in the future, but use of the evidence is more likely to compromise the integrity of the courts." Dunaway v. New York, 442 U.S. 200, 218 (1979).

In this case, the consent to search obtained from defendant was executed in a parking lot, four-tenths of a mile from his home, while he was seated in the back of a police cruiser. There was no intervening event whatsoever. Further, at least one police officer testified that, although he departed the scene within ten minutes of the arrest, he observed the handgun case being removed from the home. This evidence suggests that defendant was asked to consent to a search and seizure that already had occurred.[15] With respect to the final factor—the purpose of the official misconduct, a warrantless arrest in the home—there is no question that there was probable cause to arrest defendant for a brutal homicide. This factor, however, fails to establish that the consent to search was sufficiently attenuated from his illegal arrest. Cf. O'Dell, 576 A.2d at 427 (search did not violate Fourth Amendment where the defendant's mother consented to the search of a vacant home and the defendant was arrested pursuant to an arrest warrant).

The same can be said with respect to Cira. It should be noted that there is no claim before us that Cira was without authority to consent to a search of her son's bedroom. Although

---

[15] It cannot be said that the seizure of the handgun case falls within the ambit of the plain-view doctrine, because the warrantless entry by the police into defendant's home was constitutionally impermissible. See Horton v. California, 496 U.S. 128, 136 (1990) ("It is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed."); State v. Hockenhull, 525 A.2d 926, 932 (R.I. 1987) ("The plain[-]view doctrine is not applicable unless the items seized are evidence of a crime that came into view of an officer lawfully present on the premises searched.").

Det. Mee testified that defendant was asked to consent to a search of his bedroom "[b]ecause he ha[d] a reasonable expectation of privacy in his bedroom," the question of whether his mother also could provide valid consent to search that bedroom has not been raised. See Linde, 876 A.2d at 1125 (Although one who has common authority over the premises to be searched may give valid consent to search, this doctrine "must be applied cautiously to prevent erosion of Fourth Amendment protections." (quoting State v. Farrell, 443 A.2d 438, 442 (R.I. 1982))). Nonetheless, it is incumbent upon the Court to weigh all of the circumstances surrounding a consent to search by a "careful sifting of the unique facts and circumstances of each case * * * involving consent searches." Schneckloth, 412 U.S. at 233.

The facts in this record fail to demonstrate that the state overcame the presumptive invalidity of the consent to search executed by defendant's mother. This is so because of the temporal proximity of the consent—within moments of her son's departure in police custody—with several police officers remaining in her home; Cira was described by various witnesses as "crying," "in shock," and "nervous." In addition to the immediacy of the request to consent to the search, there are no intervening circumstances on this record to establish that the consent to search was sufficiently attenuated from the illegal entry into the home as to dissipate the primary taint of the illegal entry. See State v. Parra, 941 A.2d 799, 805 (R.I. 2007); Casas, 900 A.2d at 1135.

Accordingly, the motion to suppress the evidence seized from the defendant's bedroom should have been granted.

### Conclusion

This is a decision that is not lightly undertaken. However, the Fourth Amendment to the United States Constitution is designed to "protect[] people, not places." Katz v. United States,

389 U.S. 347, 351 (1967). Accordingly, the exclusionary rule is designed as a prophylactic measure to assure that police officers do not stray from their constitutional boundaries, Johnson, 333 U.S. at 14, particularly within the sanctity of the home, Payton, 445 U.S. at 589-90. For the reasons set forth herein, I concur in the decision of the majority to vacate the judgment of conviction in this case and to remand this case to the Superior Court.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**       State v. Tony Gonzalez.

**CASE NO:**             No. 2013-289-C.A.
                         (K1/12-341A)

**COURT:**               Supreme Court

**DATE OPINION FILED:**  March 29, 2016

**JUSTICES:**            Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**          Associate Justice William P. Robinson III

**SOURCE OF APPEAL:**    Kent County Superior Court

**JUDGE FROM LOWER COURT**:

                         Associate Justice Bennett R. Gallo

**ATTORNEYS ON APPEAL:**

                         For State:   Virginia M. McGinn
                                        Department of Attorney General

                         For Defendant:  Lara E. Montecalvo
                                        Office of the Public Defender